**Darrell Lee TATE and Charles Titus Biggoose, Appellants,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–76–418.**

Court of Criminal Appeals of Oklahoma.

Nov. 23, 1976.

W. L. Funk, Asst. Public Defender, Oklahoma County, for appellants.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Annis Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellants, Darrell Lee Tate and Charles Titus Biggoose, hereinafter referred to as defendant Tate and defendant Biggoose, were charged, tried and convicted, conjointly, for the crime of Burglary in the First Degree, in the District Court, Oklahoma County, Case No. CRF–75–2844, in violation of 21 O.S.1971, § 1431. Jury trial was had before the Honorable Chad Bledsoe on the 18th day of November, 1975. Both defendants were sentenced in accordance with the jury's verdict, defendant Tate receiving twelve (12) years' im-

prisonment and defendant Biggoose receiving twenty (20) years' imprisonment. From said judgments and sentences this appeal has been timely perfected.

The State's evidence consisted of the testimony of four witnesses, the first being James Neill North. Mr. North stated that he was the owner, operator of a bookstore located at 115 South Hudson in Oklahoma City, Oklahoma County, and that he had leased this building for the past twenty years. He further stated that he used the upper part of that building as his apartment. He further explained that he could enter his living quarters either from a stairway from inside his bookstore, or an independent stairway leading directly to the apartment from the alley behind the building. However, due to a hip condition at that time, it was often necessary for him to sleep downstairs in the bookstore portion rather than in the upstairs apartment. This was the case on the 31st day of July, 1975. Mr. North testified that in the middle of the night he was awakened by what sounded like a crash of glass and that before going to investigate, he pressed a silent alarm connected to the Oklahoma City Police Department. After pressing the alarm, he observed that a ten foot high window leading into his apartment had been broken. Upon the arrival of the police, Mr. North and one officer went upstairs, after which Mr. North was sent back downstairs. Mr. North testified that he then observed a police officer coming downstairs with one of the defendants in custody. Upon the request of the police, Mr. North then checked to discover if anything was missing but found nothing had been removed or taken. Mr. North was then shown a dagger, which he identified as State's Exhibit No. 1, as being an antique dagger belonging to him which had been handed down to him from his family.

On cross-examination, Mr. North explained that the window through which the burglar had entered was oblong with four panes of glass and that inside, a little ledge ran along the bottom, where he kept sever-

al expensive items. He also related that the stairway from the alley led only into his apartment and not into his store downstairs or his neighbor's place of business next door. He reiterated that on the night of the burglary he was not sleeping in his apartment, but was in the bookstore.

On re-direct examination, Mr. North explained that ten of the fifteen rooms on the second floor of the building he occupied were used as storage for extra books, and were not open to the general public. He stated that his retail bookstore was called "A Points Northe" which was located at 115 South Hudson. He further stated that he considered the bookstore in his apartment located at 117 South Hudson to be one and the same building, since he was able to go back and forth between the two either inside the building or by the stairway outside the building.

The next witness on behalf of the State was Officer Roy Sellers. He stated that he was on duty with the Oklahoma City Police Department on the 31st day of July, 1975, and was called to answer a silent alarm at 115 South Hudson, Oklahoma City, Oklahoma. He stated that when he arrived at approximately 2:20 a. m., he observed Officer Lehr escorting defendant Tate to his vehicle. Officer Lehr then informed Officer Sellers that he had reason to believe that there was another suspect inside the building. At that time, Officer Sellers and Mr. North proceeded upstairs where he turned on a light and saw a shadow going around the corner. The officer yelled for the person creating the shadow to stop, and ordered him to come back. Responding to this command, defendant Biggoose appeared. Officer Sellers then checked defendant Biggoose for weapons and found the dagger in his right waistband which he confiscated immediately. Officer Sellers then related that he tagged the dagger, State's Exhibit No. 1, and placed it in the Oklahoma City Police Department Property Room. At this time the exhibit was offered and admitted into evidence. Officer Sellers then formally arrested and handcuffed defendant Biggoose and took him to the patrol car. He then related that Officer Lehr transported defendant Tate to the Oklahoma City Jail, while he took defendant Biggoose to the Oklahoma City Jail.

The next witness for the State was Detective David Whitfill. He explained that on the 31st day of July, 1975, he had an occasion to speak with defendant Tate. He initially advised him of his rights. Thereafter, defendant Tate related that he and another man had entered the alley behind 115 South Hudson in the early morning hours. He declared that he was arrested at that location by a police officer moments later. On cross-examination, Detective Whitfill testified that defendant Tate told him he had not assisted defendant Biggoose in climbing through the window at Mr. North's apartment.

The fourth and final witness for the State was John Moore Lehr. He testified that he was an Oklahoma City Police Officer and that on the 31st day of July, 1975, he responded to a vandalism call at 115 South Hudson, and upon his arrival was informed by the owner, Mr. North, that someone had been breaking his windows. After ascertaining that there was a back entry on the north side of the building, Officer Lehr proceeded to that location and began to climb the stairway; he noticed that the window, approximately ten feet above the ground, had been broken and that several items on the window sill had been pushed off into the stairway inside the building. Officer Lehr testified that he came to the conclusion that someone was inside the building. He drew this conclusion from the fact that the window was too high for someone to have climbed through without some type of help. He explained that when he and Mr. North reached the ground, he observed defendant Tate standing in the two and one-half or three foot wide alley-way between the buildings underneath the broken window. At that time he took defendant Tate to the scout car and called for additional help.

He further testified that shortly thereafter, Officer Sellers emerged with defendant Biggoose. Both defendants were advised of their rights and transported to the Oklahoma City Jail. Officer Lehr testified that, in his opinion, in order for someone to enter the ten foot high window, he would have to use a ladder or be lifted up by another person. On cross-examination, this witness submitted that the walls between Mr. North's bookstore and the back of the next-door building were close enough that one could possibly have climbed the walls in a "chimney sweep fashion," but he did not believe someone could enter the window without assistance from the ground.

■ The defendants urge, in their first assignment of error, that the State did not prove that the complaining witness, James North, was inside the burglarized building at the time the crime was committed, thus making it impossible for them to be convicted of Burglary in the First Degree. With this argument we do not agree. The pertinent part of 21 O.S.1971, § 1431 reads as follows:

> "Every person who breaks into and enters in the night time the dwelling house of another, in which there is at the time some human being, with intent to commit some crime therein, . . .
>
>     \*    \*    \*    \*    \*    \*
>
> ". . . is guilty of burglary in the first degree."

We are of the opinion that the term "dwelling house" accurately describes the building located at 115 South Hudson and 117 South Hudson as a whole, by simply referring to 21 O.S.1971, § 1439, which reads as follows:

> "The term 'dwelling-house' as used in this article, includes every house or edifice, any part of which has *usually been* occupied by any person lodging therein at night, and any structure *joined* to and immediately connected with such a house or edifice." [Emphasis added]

Obviously, from the record, the apartment and the bookstore occupied by the witness North were under the same roof and part of the same dwelling. The witness testified that he had lived in the upstairs apartment approximately twenty years. He further testified that he considered the bookstore and his apartment located at 117 South Hudson to be one and the same, since he was able to go back and forth between the two by way of the inside stairway.

We have previously held, in *Harris v. State,* 41 Okl.Cr. 121, 271 P. 957 (1928), that a garage connected to a house which has a passage way connecting the two is such a dwelling, the breaking and entering of which, with the essential intent, can constitute Burglary in the First Degree. In the earlier case of *Simpson v. State,* 5 Okl.Cr. 57, 113 P. 549 (1911), this Court held that a poolhall which was connected to a hotel building was a dwelling house under our statute. Furthermore, the witness North testified that he usually occupied the upstairs portion of the building where defendant Biggoose was apprehended, but was not in that portion at this particular moment and time due to a bad hip which made it difficult for him to climb the stairs. However, the evidence is clear that the victim was actually sleeping in a structure joined to and immediately connected with such a house or edifice as defined by our statute. Therefore, we find that the evidence is clear and convincing that the building, or edifice, was in fact used as a dwelling house and was broken into in the nighttime, and that some form of larceny by defendant Biggoose was committed therein.

■ For the second assignment of error the defendants allege that a variance existed between the address of the alleged burglary on the information and that which was proven at trial. More specifically, that the information alleged that 115 South Hudson was burglarized, while in truth and fact, the proof showed that the burgla-

ry occurred at 117 South Hudson. We find this discrepancy to be one of form only, and not of substance. The question is, of course, was this variance between the description in the information and the proof at trial such that it prejudiced the defendants in their ability to prepare their defense. We find this not to be the case. In *Haney v. State,* Okl.Cr., 503 P.2d 909 (1972), this Court addressed itself to that problem:

". . . [W]e note the only difference between the first amended and the second amended Information is a more particular description of the premises which was alleged to have been burglarized. Appellant's argument that he was·unable to defend inasmuch as he could not tell the place he was accused of burglarizing can hardly be said to be one of substance inasmuch as he must have had knowledge of the location involved at the preliminary hearing."

The defendants could not have been confused or misled by the description of the burglarized building in the instant case as is obvious from the fact that no Demurrer to the information was filed. The present information obviously apprised the defendants of the charge against them and meets the test of sufficiency as set forth in *Fish v. State,* Okl.Cr., 505 P.2d 490 (1973), citing with approval *Jones v. State,* 94 Okl. Cr. 15, 229 P.2d 613, as follows:

" 'The test of the sufficiency of an information is whether it alleges every element of the offense intended to be charged, and sufficiently apprises defendant of what he must be prepared to meet and so defines and identifies the offense that if convicted or acquitted the accused will be able to defend himself against any subsequent prosecution for the same offense.' "

Since it is elementary that the State relies on the fact that the first and second floors of this building comprise one entity and therefore the defendants are triable for the offense of Burglary in the First Degree, the State could not later be heard to assert that they are separate entities and charge separate offenses for burglary of 115 South Hudson and again for burglary of 117 South Hudson. Therefore, we find this argument to be without merit.

For his third assignment of error, defendant Tate alleges that the Court erred when it refused to sustain his demurrer to the State's evidence; particularly for the reason that there was no direct evidence as to defendant Tate's participation in the crime charged. While this assignment of error possesses some merit, we are of the opinion that there was sufficient circumstantial evidence to justify the court in overruling defendant Tate's demurrer. However, we are of the further opinion that prejudicial error was committed when the following occurred during the examination of Officer Lehr:

"[JOHN LEHR] . . . I took Biggoose in my scout car to the Oklahoma City jail, placed him in the holdover cell, placed my weapon in the lockers, put the handcuffs on the—on the door which is the way we lock our guns in the cabinet. "I read the rights card which I carry in my billfold. (The witness removed his billfold from his pocket and removed a card therefrom.) I told him he—I read it off just like this, I said, 'You have the right to remain silent, anything you say can and will be used against you in a Court of law. You have the right to talk to a lawyer or have him present while you are being questioned. If you cannot afford a lawyer one will be appointed to represent you ˙before any questions, if you wish one. If you do decide to make a statement, you may stop at any time.'

"Q. [MR. GEB]: All right, did he say he understood that?

"A. Did I say that he understood it?

"Q. Yes. Did he say he understood it?

"A. I asked him if he understood it and he nodded—nodded his head and then I asked him some questions. I asked him

his name which he told me was Charles Titus—uh—Charles Titus Biggoose, I believe. And, I asked him how he got in the building. He said, 'he boosted me up.' I asked him a couple of other questions but he said he didn't want to answer any more questions until he talked to a lawyer, so I said, 'O.K.'

"So, upon the arrival of the other officers—

"Q. But, he said he boosted Biggoose up, is that what he said?

"A. No, he said he was boosted up. I asked him how he got in the building.

"MR. WOMACK: I object, Your—

"THE COURT: One moment.

"MR. WOMACK: Please, I object to that, the nature of that, and ask it be stricken from the record because only Biggoose is present. Any statement made by Biggoose relating to this defendant is not admissible. Tate was not present.

"MR. GEB: We would ask for a severance, Your Honor. It would be admissible.

"THE COURT: I will overrule that objection.

"MR. WOMACK: Exception.

"THE COURT: Exception is allowed.

"THE WITNESS: He was not present at that time, Your Honor, if that's the—

"THE COURT: I couldn't hear you then, I guess.

"THE WITNESS: He was not present. The other offender was not present when I was talking . . .

"THE COURT: Both defendants were not present at this time?

"THE WITNESS: He had not come up there yet while I was talking to Biggoose. Darrell Lee Tate was not present

at that time. Does that answer the question?

"THE COURT: I thought you had arrested Tate yourself?

"THE WITNESS: I did at the scene but I transported Biggoose.

"THE COURT: O.K., and this—

"THE WITNESS: (Interposing) and the other one was being transported by the other officer.

"THE COURT: Well, this happened in the jail then?

"THE WITNESS: Right, just prior to booking.

"MR. WOMACK: Well, that's the basis of my objection.

"THE COURT: O.K. I'll sustain your objection then.

"MR. WOMACK: I ask the jury to disregard it.

"THE COURT: One moment. You jurors disregard the statement by the witness concerning the description of the assistance of the boosting that the witness here stated Mr. Biggoose said that Mr. Tate gave him. It should be stricken from consideration when you are determining the issues in this case because I'm ruling that that is inadmissible evidence.

* * *" [Tr. 32–35]

Although the trial court properly sustained the defense counsel's objection to such testimony and the court admonished the jury to disregard it, such admonishment did not cure the error which was a clear violation of the rule enunciated in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); particularly in light of the fact that neither defendant testified in his own behalf. Moreover, since the evidence of defendant Tate's involvement in the commission of the crime was wholly circumstantial, the

**1020**

trial court erred in failing to give an instruction regarding circumstantial evidence as to defendant Tate. While this Court has held that it is not error for the trial court to fail to give an instruction on circumstantial evidence when such an instruction has not been requested[1], we are of the opinion that the violation of the *Bruton* rule, coupled with the failure of the trial court to give an instruction on circumstantial evidence, is reversible error as to defendant Tate.

■ The final assignment of error presented by defense counsel concerns the closing arguments made by the prosecution; more specifically, that certain statements made by the prosecutor were attempts to prejudice and influence the jury against the defendants. We have carefully examined the closing arguments referred to in defendants' brief, and find that only one of the closing remarks assigned as error was objected to, and this remark was not so fundamental or prejudicial, in light of the overwhelming evidence of defendant Biggoose's guilt, to require reversal. However, since defendant Biggoose received the maximum punishment provided by law, we find that the ends of justice would best be served by modifying the judgment and sentence as to defendant Biggoose from a term of Twenty (20) years' imprisonment, to a term of Twelve (12) years' imprisonment.

For all of the above and foregoing reasons the conviction against Darrell Lee Tate is REVERSED AND REMANDED FOR A NEW *TRIAL,* and the judgment and sentence rendered against Charles Titus Biggoose, is *MODIFIED* from a term of twenty (20) years' imprisonment, to a term of twelve (12) years' imprisonment, and as so *MODIFIED,* that judgment and sentence is *AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.

---

1. See *Lawson v. State,* Okl.Cr., 476 P.2d 89 and *Jones v. State,* Okl.Cr., 488 P.2d 372